1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RICKY VAN TRAN,                          No. 2:17-cv-1925 JAM KJN P

12                  Petitioner,

13        v.                                   FINDINGS & RECOMMENDATIONS

14   DAVID BAUGHMAN,

15                  Respondent.

16

17   I.  Introduction

18        Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2011 conviction for two

20   counts of murder and one count of attempted murder, with related enhancements.  Petitioner was

21   sentenced to life without the possibility of parole plus twenty years in state prison.  Petitioner

22   asserts two claims concerning his constitutional right against self-incrimination and two claims

23   concerning the admission of certain evidence.  After careful review of the record, this court

24   concludes that the petition should be denied.

25   II.  Procedural History

26        On December 14, 2011, a jury found petitioner guilty of two counts of murder (Cal. Pen.

27   Code, § 187(a)), one count of attempted murder (Cal. Pen. Code, § 664/187(a)), three separate

28   enhancements as to each of the foregoing counts for personal use of a firearm (Cal. Pen. Code, §

1  12022.5(a)/(1)); and the jury also found true an enhancement for multiple murder (Cal. Pen.

2  Code, § 190.2(a)(3)).  (1 CT 245-48.)  On February 17, 2012, petitioner was sentenced to an

3  indeterminate sentence of life without the possibility of parole on counts one and two, to be

4  served consecutively, and to a consecutive determinate term totaling twenty years, in state prison.

5  (2 CT 318-21.)

6        Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

7  District.  (LD 8; 2 CT 322.)  The Court of Appeal affirmed the conviction on May 5, 2016.  (LD

8  11.[1])

9        Petitioner filed a petition for review in the California Supreme Court (LD 12), which was

10  denied on July 13, 2016 (LD 13).

11        Thereafter, petitioner filed the instant petition on September 15, 2017.  (ECF No. 1.)

12  Respondent filed its answer on February 26, 2018 (ECF No. 12), and petitioner filed a reply on

13  May 9, 2018 (ECF No. 17).

14  III.  Facts[2]

15        In its unpublished memorandum and opinion affirming petitioner's judgment of

16  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

17  following factual summary:

18            There was a shooting at Craven Club between 11:30 p.m. and
             midnight on October 25, 1991. Quon Tran (aka Cujo) and Huy
19            Nguyen (aka Joey) died of gunshot wounds.[] Long Nguyen was shot
             in the leg or ankle. Police located a .38 or .357 caliber damaged bullet
20            at the scene.

21            Police interviewed witnesses to the shooting within hours or days of
             the shooting. Tuan Phan (aka Bobby) and Hoang Nguyen (aka Spud)
22            identified defendant as the shooter from a photographic lineup and
             believed defendant was an Oriental Boys (O.B.) gang member.
23            Bobby and Spud identified the suspect vehicle as a blue Oldsmobile.
             Bobby saw defendant pull out a .38 or .357 revolver. Spud said the
24            shooter's name was Ricky.

25  _____

[1] Lodged Document 11 is incorrectly labeled "Opinion, filed in California Supreme Court, case
26  number. S235100."

27  [2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
     District in People v. Tran, No. C070706 (5/5/2016), a copy of which was lodged by respondent as
28  Lodged Document 7.

Thoai Van Bui and his brother Tuan told police that they heard gunshots coming from a blue, two-door Oldsmobile. Tuan saw a hand go back inside the front window of the Oldsmobile. He reported that the front passenger of the Oldsmobile was a young Asian male with a long ponytail.

Hang Nguyen (aka Jake) told police he saw defendant at Tudo Pool Hall (Tudo) on the night of the shooting. Tudo was between one to one and a half miles from Craven Club. Jake said defendant may have left Tudo with his brother before 10:00 or 10:30 p.m. and defendant's brother was driving a blue, two-door Oldsmobile. Jake told police defendant said he was going to Craven Club to "check out a party." According to Jake, defendant said someone at the party tried to hit defendant, and defendant left the party and returned to the pool hall. Jake said he did not see defendant with a gun on the night of the shooting, but defendant told Jake the day before the shooting that defendant had a .38.

Police determined that defendant's mother owned a 1983 Oldsmobile Cutlass. The car was freshly painted a dark color when a Livermore police officer stopped it 10 days after the Craven Club shooting.

A warrant issued for defendant's arrest. A nationwide manhunt ensued but law enforcement officials could not locate defendant.

Almost two decades later, on January 20, 2010, defendant was arrested in Cheltenham, Pennsylvania. Defendant told police his name was Thieu Tran. Thieu is defendant's younger brother. Law enforcement officials later determined defendant's true identity using his fingerprints.

Bobby testified at defendant's trial. He was at Craven Club with Spud, Long, and Cujo on October 25, 1991. According to Bobby, Long, Spud, and Bobby were members or associates of the Nip Boys gang. The Nip Boys and the O.B. were rival Asian gangs.

Bobby recalled that a group of people including Long, Cujo, Bobby, and Spud went outside Craven Club at about 10:30 p.m. Bobby noticed a light blue or grey, two-door Oldsmobile Cutlass approaching slowly, with the headlights off. Bobby saw defendant in the Oldsmobile when the car was about 10 feet from Bobby. Bobby knew defendant.[] Defendant wore his long hair in a ponytail. Bobby turned to Spud and said "is O.B.s" because Spud had a fight with defendant the prior week. Bobby saw defendant lean out the passenger's side window of the Oldsmobile and point a .38 or .357 revolver. Bobby heard four or more loud gunshots and yelled defendant's first name after the gunshots were fired. Phat Duc Lam (aka Patrick) and Man Tran (Cujo's brother) testified that they heard Bobby call out defendant's name after the shooting. Bobby told the jury he had no doubt defendant was the shooter.

Spud's trial testimony was generally consistent with that of Bobby. Spud said he was outside Craven Club with Bobby when he saw two cars drive by slowly. The first car was dark in color and could have been a two-door Oldsmobile. The second car was white in color.

Spud saw the person in the front passenger seat of the dark colored car pull out a gun and shoot. The shooter had long hair which was tied back. Spud recognized the shooter because he had seen that person on a couple of prior occasions.

Tuan Bui told the jury he saw a hand going back into the front passenger side of a light colored Oldsmobile after he heard gunshots. He said the front passenger of the Oldsmobile had a ponytail.

Jake testified he and defendant were O.B. gang members. Jake said he rode in a light blue Oldsmobile Cutlass that belonged to defendant's family with defendant's brother Thieu on the night of the shooting. They went to Tudo where Jake saw defendant playing an arcade game. Defendant told Jake he was going to Craven Club to "check something out." Jake saw defendant again at the pool hall at about 9:15 or 9:30 p.m. Defendant told Jake he had been at Craven Club and someone tried to hit him. Defendant left Tudo at about 10:00 or 10:30 p.m. and Thieu might have left with defendant. Contrary to his statement to police, Jake testified that he had never seen defendant with a gun. However, Jake said defendant told him, sometime before the shooting, that defendant had a .38 caliber gun and kept it in the car.

Defendant testified at his trial, stating he did not remember what he did on October 25, 1991. But he went to Craven Club sometime in late October 1991 to look for his younger brother because his younger brother took their mother's car without permission. Defendant got a ride to Craven Club from someone whose identity he could not recall at the trial.

Defendant saw people, including Bobby, standing outside Craven Club. He knew Bobby and Spud were Nip Boys gang members. Someone defendant associated with Bobby said to defendant, "what the hell are you looking at" or something to that effect. Defendant returned to Tudo at 8:00 or 8:30 p.m. and took his brother home. Defendant denied shooting anyone.

Defendant heard about the shooting at Craven Club and learned that the police were looking for him in relation to the shooting. He was scared because he had heard the police tortured people to get false confessions. He thought no one would believe him because he was a gangster. As a result, he fled Sacramento in his mother's car. He gave police a false name when they pulled him over in Livermore on November 4, 1991, because he knew he was wanted for murder. He fled California and lived in Philadelphia under a false name until his arrest in January 2010. Defendant admitted he gave police his brother's name when he was arrested in 2010.

Defendant denied telling Jake he had a .38 caliber gun and said he did not have a ponytail in October 1991.

Defendant asserted the defense of mistaken identity. His trial counsel theorized that the shots could have come from either car described by the witnesses. Defense counsel noted that witnesses saw flashes coming from a white car and Thang Bui, a Nip Boys gang member,

was in the white car. He said there was another Nip Boys gang member in the blue car. Defense counsel argued the shooters saw their fellow Nip Boys gang member Long under attack outside Craven Club and started shooting.

(People v. Tran, LD 11 at 2-6, fns. omitted.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court

5

jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 63 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [3] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 298 (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

7

1    Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

2    review of the constitutional issue, but rather, the only method by which we can determine whether

3    a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no

4    reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

5    reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

6         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

7    Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze

8    just what the state court did when it issued a summary denial, the federal court must review the

9    state court record to determine whether there was any "reasonable basis for the state court to deny

10   relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could

11   have supported the state court's decision; and then it must ask whether it is possible fairminded

12   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

13   decision of [the Supreme] Court." Id. at 101. The petitioner bears "the burden to demonstrate

14   that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d

15   925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

16        When it is clear, however, that a state court has not reached the merits of a petitioner's

17   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

18   habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

19   F.3d 1099, 1109 (9th Cir. 2006).

20   V. Petitioner's Claims

21        A. *Doyle Error*

22        Petitioner claims that the trial court committed prejudicial error and violated his privilege

23   against self-incrimination when it permitted the prosecutor to question him about his post-arrest

24   silence. (ECF No. 1 at 7-8 [ground one]; ECF No. 17 at 13-18.) Relatedly, petitioner contends he

25   made a sufficient showing that he received Miranda warnings before exercising his right to

26   remain silent. (ECF No. 1 at 12-13 [ground three]; see also ECF No. 17 at 13-18.) Respondent

27   contends the state court's determination is reasonable, thus barring relief in these proceedings.

28   (ECF No. 12 at 18-26.)

The last reasoned rejection of petitioner's <u>Doyle</u>-error claims is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Defendant argues the trial court violated his rights to due process and against self-incrimination when it permitted the prosecutor to question him about his refusal to discuss his case with his friend Jake during a jailhouse visit. Defendant says he invoked his right against self-incrimination when he told Jake he did not want to talk about his case. According to defendant, the prosecutor committed *Doyle* error by asking defendant why he would not discuss his case with Jake if he was innocent. Defendant says reversal is required under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

> The prosecutor asked defendant during cross-examination whether he had contact with Jake before his 2010 arrest. The question followed a series of questions about whether defendant ever talked to his brother Thieu and his wife Daisy about what happened in 1991. Defendant replied that he might have had contact with Jake before his arrest. Defendant testified that Jake visited him in jail in 2010 when the prosecutor asked when defendant last spoke with Jake. Defendant could not remember what he and Jake talked about during the jailhouse visit. The prosecutor then asked whether there was any reason defendant did not want to talk openly with Jake about the case. Defendant answered that he knew he could not discuss his case because everything was being recorded. The prosecutor followed up, "Why do you care if you discuss the case if the phone call is recorded? Why does it matter?" Defense counsel objected to the questions and asked to approach the bench. An unreported conference between counsel and the trial judge followed. The prosecutor then continued asking questions about the jailhouse visit. The prosecutor asked why defendant was reluctant to talk openly with Jake about what happened in 1991. Defendant responded that he knew he was not supposed to say anything over the phone. Defendant responded "I don't know" when the prosecutor asked if defendant was concerned about talking with Jake about what happened in 1991.

> The Attorney General argues defendant forfeited his claim of *Doyle* error by failing to object in the trial court. Failure to object at the trial can result in forfeiture. (*People v. Hughes* (2002) 27 Cal.4th 287, 332.) Here, however, the record shows defendant's trial counsel objected to the prosecutor's question about why defendant would not discuss his case with Jake. Although the record does not show the basis for counsel's objection and we cannot confirm it was based on *Doyle*, we will assume defendant preserved his claim of *Doyle* error

9

for review and consider the merits of the claim. (*People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6.)

"'In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony. [Citation.]'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1212.) The Attorney General points out that nothing in the record shows defendant received *Miranda* warnings or invoked his right to remain silent. We agree there is no evidence in the record that defendant was advised of his *Miranda* rights.[] *Doyle* is not implicated by the use of pre-*Miranda* silence. (*Fletcher v. Weir* (1982) 455 U.S. 603, 607 [71 L.Ed.2d 490, 494]; *Jenkins v. Anderson* (1980) 447 U.S. 231, 238–239 [65 L.Ed.2d 86, 95–96].)

But even assuming that the prosecutor's inquiry about defendant's silence violated *Doyle*, we conclude beyond a reasonable doubt that any such *Doyle* error did not contribute to the verdict. "'""When deciding whether a prosecutor's reference to a defendant's post-arrest silence was prejudicial, this court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt." [Citation.]'" (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1559 (*Hollinquest*).) We will not reverse the judgment for *Doyle* error if we conclude, based on the record as a whole and beyond a reasonable doubt, that the *Doyle* error was harmless. (*Id.* at p. 1558; *People v. Galloway* (1979) 100 Cal.App.3d 551, 559–560 (*Galloway*).)

Defendant's testimony about his jailhouse conversation with Jake was brief, taking up about five pages of over 100 pages of defendant's trial testimony in the reporter's transcript. Moreover, the prosecutor did not mention defendant's testimony about his jailhouse conversation with Jake during his closing and rebuttal statements to the jury. Unlike the prosecutors in *Hollinquest* and *Galloway*, the prosecutor in this case did not argue to the jury that defendant's silence evinced a consciousness of guilt. (*Hollinquest, supra*, 190 Cal.App.4th at p. 1558; *Galloway, supra*, 100 Cal.App.3d at p. 560.)

In addition, the evidence of defendant's guilt is strong. Bobby yelled out defendant's name right after the shooting. Bobby knew defendant. Man Tran and Patrick heard Bobby call out defendant's name. Man told a police officer who responded to the scene that Bobby saw the shooter. Bobby's spontaneous and immediate identification of the shooter is compelling evidence.

Bobby and Spud focused their attention on the car within which they

saw the shooter. Spud told police he was standing next to Bobby, Bobby asked Spud if Spud knew the person in an approaching car, and Spud recognized that person as defendant. Bobby told police he and Spud recognized the front-seat passenger as an O.B. gang member. Bobby's trial testimony was consistent with his and Spud's reports to police in October 1991. Bobby testified that he saw defendant in the Oldsmobile. He knew defendant was an O.B. gang member. And he told Spud "is O.B.s" as a warning because he knew Spud, a member of the rival Nip Boys gang, had a fight with defendant the prior week. On the other hand, there is no evidentiary support for the defense theory that a Nip Boys gang member in the blue Oldsmobile shot at the crowd because he saw his fellow Nip Boys gang member Long in a fight.

Bobby and Spud told police the shooter's name was Ricky. Although Bobby did not initially tell police that he recognized the shooter because he was worried about being labeled a snitch, Bobby identified defendant as the shooter within a few days after the shooting. Spud also identified defendant as the shooter in October 1991. Bobby told the jury he had no doubt defendant was the shooter.

Bobby reported seeing defendant pull out a .38 or .357 caliber revolver. Police located a .38 or .357 damaged bullet at the scene of the shooting. And defendant told Jake he had a .38 caliber gun.

Defendant's family owned a light blue Oldsmobile Cutlass which matched the description of the suspect vehicle provided by multiple eyewitnesses. Bobby told police the shooter was in a light blue or grey Oldsmobile Cutlass. Spud said the shooter was in a blue Oldsmobile or Buick Regal. Thoai reported that he saw a dark blue Oldsmobile or Monte Carlo driving around in the parking lot before the shooting, and he heard gunshots coming from that car. Tuan told police he heard gunshots coming from the front of a light blue Oldsmobile and saw a hand go back inside the front window of the Oldsmobile after the shooting. Tuan also reported that the front passenger of the Oldsmobile had a long ponytail, which matched the description of defendant's 1991 hairstyle given by Jake and Detective Fong. Bobby, Spud, Tuan, and Thoai also saw a white car driving in the parking lot, but they did not connect the shooting with the white car.

Some witnesses associated the gunshots with a white car. Luong Dinh and Thang Bui were in a white Celica which was behind a blue car that had stopped in front of Craven Club before the shooting. But no one identified Luong or Thang as a shooter.

The trial court instructed the jury to decide what evidence, if any, to believe if it determined there was a conflict in the evidence. The trial

court also described factors the jury could consider in evaluating a witness's testimony, including how well the witness could see during the incident. It is clear the jury credited the testimony which associated the gunshots with the blue car.

There was also evidence from which the jury could find that the shooting was gang motivated. Defendant admitted he was an O.B. gang member and that Bobby and Spud were members of the rival Nip Boys gang. Defendant testified he saw Bobby outside Craven Club in late October when he went to the club to look for Thieu; he said someone associated with Bobby challenged defendant. Bobby testified that Spud had a fight with defendant the week before the Craven Club shooting. Detective Fong testified there was a shooting at Tudo, an O.B. hangout, some months before the Craven Club shooting, and there had been incidents involving O.B. and Nip Boys gang members at Craven Club prior to the October 25, 1991 shooting. The gang evidence supported the jury's finding that defendant was the shooter.

Further, there was undisputed evidence of consciousness of guilt apart from defendant's silence during the jailhouse conversation with Jake. Defendant fled in the Oldsmobile after he learned he was wanted for the Craven Club shooting. The Oldsmobile had been freshly painted in a different color. Defendant gave police a false name when police stopped him in Livermore, and again when he was apprehended in Pennsylvania. He changed his name and evaded police capture for about 18 years.

On this record, we do not agree with defendant's claim that the prosecutor "tipped the balance" on the question of defendant's guilt by questioning him about his refusal to discuss his case openly with Jake. The evidence of defendant's silence during the jailhouse conversation with Jake did not fill an evidentiary gap in the prosecution's case or touch a "'live nerve in the ... defense.'" (*Galloway, supra*, 100 Cal.App.3d at p. 560.) Considering all of the evidence and the closing remarks by counsel and assuming that the prosecutor committed *Doyle* error, any such error was harmless.

(People v. Tran, LD 11 at 6-11, fn. omitted.)

*Relevant Legal Standards*

A suspect has a constitutional right not to speak to police after he is arrested and given his Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 479 (1966). As a consequence of that right, prosecutors are prohibited from commenting on a defendant's post-Miranda silence. Doyle

v. Ohio, 426 U.S. 610, 618-19 (1976); United States v. Lopez, 500 F.3d 840, 844 (9th Cir. 2007) (prosecutor's comment on defendant's post-Miranda silence violates Doyle). The rationale for this rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." Wainwright v. Greenfield, 474 U.S. 284, 291 (1986) (citation and internal quotation marks omitted) (holding that prosecution may not use defendant's silence during case-in-chief); see also Hurd v. Terhune, 619 F.3d 1080, 1086 (9th Cir. 2010) (a "criminal defendant's reliance on his right to remain silent may not be used against him in any way at trial, including for impeachment"). Generally speaking, however, prosecutors are allowed to comment on a defendant's pre-arrest silence. Jenkins v. Anderson, 447 U.S. 231, 240-41 (1980); United States v. Oplinger, 150 F.3d 1061, 1067 (9th Cir. 1998) ("[N]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment, in the face of accusations of criminal behavior") (internal quotation marks and citation omitted), overruled on other grounds, United States v. Contreras, 593 F.3d 1135 (9th Cir. 2010) (en banc).

Doyle error does not entitle a petitioner to habeas relief unless it "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 622 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 766 (1946)); cf. Greer v. Miller, 483 U.S. 756, 768-69 (1987) (Stevens, J., concurring) (explaining the different standard applied to a Doyle error on direct review to that applied on habeas review). When determining whether a Doyle violation constitutes harmless error, this court considers three factors: "[1] the extent of comments made by the witness, [2] whether an inference of guilt from silence was stressed to the jury, and [3] the extent of other evidence suggesting defendant's guilt." United States v. Velarde–Gomez, 269 F.3d 1023, 1034 (9th Cir. 2001) (en banc) (quoting United States v. Newman, 943 F.2d 1155, 1158 (9th Cir. 1991)).

////

////

////

13

*Analysis*

Here, during cross-examination of petitioner at trial, the following exchange occurred:

> [PROSECUTOR]:  Can you describe for the jury when the last time was that you spoke with Jake?

> [PETITIONER]:  I can't remember.  I think he came and visited me when I got locked up.

> Q.  After you got locked up in 2010 in Sacramento, California?

> A.  Yes.

> Q.  When you say he came and visited you, where were you?  You were in jail. Right?

> A.  Yes.

> Q.  And he came and had a conversation with you there.  Right?

> A.  Yes.

> Q.  Who did he come with?

> ………………………………………………………………………….

> Q.  We are not talking about in 1991.  We are talking about 2010.  Right?

> A.  Yes.

> Q.  Almost two years ago.  Right?

> A.  Yes.

> Q.  You don't recall what you talked with him about when he came and visited you?

> A.  No.

> Q.  Did you talk with him about the case?

> A.  I don't recall what I said.

> Q.  You don't recall if you talked with him about the case?

> A.  I don't.  It's been two years ago.  I can't remember what I said.  I don't remember what I talked about to him.

> Q.  Is there some reason that you didn't want to talk to him about the case?

> A.  I don't know.

1    Q.  Well, you are the only one who can answer this question.

2    A.  What's the question, again?

3    Q.  The question is this:  When he came and visited you, he was the
     first person to come and visit you, wasn't he?

4

     A.  The first?  I don't know if he was the first person but he did come
5    visit me.

6    Q.  And when you were talking with him, is there any reason that you
     didn't want to talk with him openly about the case at this point?

7

     A.  Well, I knew I can't discuss my - - my case, you know, because
8    everything is being recorded so I can't remember what I said.

9    Q.  Why do you care if you discuss the case if the phone call is
     recorded?  Why does it matter?

10

     [DEFENSE COUNSEL]:  Your Honor, I am going to interpose an
11   objection and ask to approach.

12   THE COURT:  All right.

13   (An unreported bench conference was held between the Court and
     counsel at the bench.)

14

     Q.  [PROSECUTOR:]  This is a visit when he comes, sits down on
15   the other side of the glass with you.  Is that correct?

16   A.  Yes.

17   Q.  And you are on the other side, and you guys are looking at each
     other face to face?

18

     A.  Yes.
19

     Q.  This is not a phone call from the jail to Texas.  Is that right?
20

     A.  Yes.
21

     Q.  You know when you are talking to him that the calls are recorded.
22   Right?

23   A.  Yes.

24   Q.  And you have been telling us all morning that, you know, you
     didn't do anything wrong in this case.  Right?

25

     A.  Yes.
26

     Q.  You were framed, what have you.  Did you have any reluctance
27   to talk with Jake openly about the facts of your case at that point?

28   A.  I don't understand your question.

1  Q. Is there any reason in your mind that you didn't want to discuss
   with Jake what had happened in 1991?

2

3  A. I just know I am not supposed to say anything over the phone so
   I am not going to say anything over the phone or, you know …

4  Q. My question really is this: Were you concerned about talking with
   Jake about what happened in 1991?  Were you concerned with

5  talking with him about it?

6  A. I don't know.

7  (4 RT 1140-44.)

8      Assuming for the sake of argument that Doyle error occurred, the state court's

9  determination is not unreasonable.

10     Where Doyle error is found, or as here, is assumed, petitioner is not entitled to relief

11 unless he can show the error produced a "substantial and injurious effect or influence in

12 determining the jury's verdict."  Brecht, 507 U.S. at 622.  Specifically, the undersigned considers

13 the extent of the comments, whether an inference of guilt from silence was stressed to the jury,

14 and other evidence suggesting petitioner's guilt.  Velarde-Gomez, 269 F.3d at 1034.

15     Here, the prosecutor's questions at issue during the cross-examination of petitioner

16 spanned just about four pages of more than 100 pages of petitioner's testimony at trial.  (4 RT

17 1066-170, 1174-75.)  That is not extensive.  Further, a review of the prosecutor's closing

18 argument reveals no mention is made of petitioner's silence giving way to an inference of guilt.

19 (5 RT 1220-66, 1300-13.)  Finally, the extent of other evidence suggesting petitioner's guilt is

20 considerable.  For example, the record establishes that petitioner was identified as the shooter.  (1

21 RT 126, 129-32, 149-50, 160, 166, 171, 173; 2 RT 596-97; 3 RT 603, 694-99, 717-18, 741, 746,

22 757, 770, 878-80, 883; 4 RT 980.)  Petitioner's family owned a vehicle matching the description

23 of the vehicle described by witnesses as containing a passenger shooting at people standing

24 outside the Craven Club.  (1 RT 142, 158-59, 249-53, 298-300; 2 RT 301-03, 322-29, 382-84; 3

25 RT 738, 806, 816-17, 871, 892, 896; 4 RT 1066, 1104, 1189.)  That vehicle was then painted

26 another color shortly after the shooting.  (3 RT 897-900; 4 RT 901, 1098, 1191-93.)  And

27 petitioner fled California, knowing he was wanted for these crimes, eluding capture for about two

28 decades by living in Pennsylvania.  (3 RT 894-896; 4 RT 903-04, 907-08, 933-34, 942, 983-84,

1070-72, 1107, 1110, 1130-31, 1137, 1152, 1155.)

In denying petitioner's claims, the California Supreme Court reasonably could have determined that Petitioner was not prejudiced from the prosecutor's isolated questions violating petitioner's right to remain silent. Cf. Brecht, 507 U.S. at 638 (holding Doyle error was harmless when prosecutor's references to post-Miranda silence comprised only two pages of lengthy transcript and evidence of guilt was weighty, if not overwhelming) & Hurd, 619 F.3d at 1090 (finding Doyle error was not harmless when prosecutor argued defendant's post-Miranda silence extensively in opening statement and closing argument). Under the facts of this case, the state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

In sum, the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254. This claim should be denied.

B. *Evidentiary Error*

Petitioner claims that the trial court committed prejudicial error and violated constitutional rights to due process and a fair trial when it permitted the prosecution to introduce evidence of petitioner's brother's arrest in Pennsylvania. (ECF No. 1 at 10-11 [ground two]; ECF No. 17 at 20-24.) Relatedly, petitioner argues there was no foundational showing of the required preliminary fact prior to the admission of the challenged evidence. (ECF No. 1 at 15-16 [ground four]; ECF No. 17 at 20-24.) Respondent argues the claims are procedurally barred in the first instance, and, in any event, the state court's determination was reasonable, precluding the relief sought. (ECF No. 12 at 27-31.)

The last reasoned rejection of petitioner's claims is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Defendant also asserts various challenges to the admission of evidence relating to his brother's arrest in 1994. The prosecution offered the challenged evidence to show consciousness of guilt and "an active and continual pattern of flight." Defendant argues the trial

court erred in admitting the evidence because the prosecution did not establish the preliminary fact that defendant knew of his brother's arrest.

Although all relevant evidence is admissible, "'[s]ometimes the relevance of evidence depends on the existence of a preliminary fact.'" (*People v. Cottone* (2013) 57 Cal.4th 269, 283.) If the relevance of proffered evidence depends on the existence of a preliminary fact, the proponent of the proffered evidence must produce evidence as to the existence of the preliminary fact. (Evid.Code, § 403.) The jury makes the final determination on the question of whether the preliminary fact exists. (*People v. Lucas* (1995) 12 Cal.4th 415, 466.) But the trial court determines whether the evidence of the preliminary fact is sufficient to allow a reasonable jury to conclude that it is more probable than not that the preliminary fact exists. (*Ibid.*; *People v. Herrera* (2000) 83 Cal.App.4th 46, 61.) The trial court excludes the proffered evidence under Evidence Code section 403 only if it finds that the showing of the preliminary fact "'"is too weak to support a favorable determination by the jury."'" (*Cottone, supra*, 57 Cal.4th at pp. 283–284.) We review a trial court's ruling on the sufficiency of the foundational evidence for a preliminary fact under an abuse of discretion standard. (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; *Lucas, supra*, 12 Cal.4th at p. 466.) Under that standard, we will not disturb the trial court's ruling except on a showing that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

The prosecutor in this case offered to prove the following with regard to the arrest of defendant's brother Thieu. Thieu was arrested in Delaware in 1994 for the October 25, 1991 murders. Thieu told police his name was Ricky Tran. Defendant's wife was present during Thieu's arrest. At that time, defendant and his wife lived one block from Thieu. The trial court concluded the jury could reasonably infer that defendant learned of his brother's arrest in 1994 based on the presence of defendant's wife during Thieu's arrest and the proximity of defendant's residence to the location of Thieu's arrest.

Defendant's trial counsel argues there is no evidence that defendant knew of his brother's arrest and thus no preliminary fact to support the relevance of the challenged evidence. But the trial court ruled the jury could infer knowledge based on the evidence presented. Defendant challenges the sufficiency of that evidence on appeal, but he did not assert such a challenge in the trial court. We do not consider claims raised for the first time on appeal. (*Cowan, supra*, 50 Cal.4th at pp. 476–477; *Partida, supra*, 37 Cal.4th at p. 434–435.) In any event, a jury could reasonably find from the prosecutor's offer of

proof that it was more likely than not true that defendant learned of Thieu's arrest in 1994. Accordingly, the trial court did not abuse its discretion in admitting the evidence concerning Thieu's arrest. Although not a basis for our conclusion, we observe that defendant testified he found out Thieu was arrested on a warrant for the Sacramento murders but did not contact the police because defendant did not want to turn himself in.

Defendant also challenges the admission of evidence of Thieu's arrest on relevance grounds. He says the evidence of Thieu's arrest was irrelevant because it was undisputed that defendant fled California and remained at large until 2010. This argument is forfeited by defendant's failure to raise it in the trial court. (Evid.Code, § 353; *Cowan, supra,* 50 Cal.4th at pp. 476–477; *Partida, supra,* 37 Cal.4th at p. 434435.) Defendant's trial counsel stated in the trial court that defendant would not dispute that defendant knew he was wanted for murder and fled California in 1991. But the statement was made in the context of arguing that evidence relating to Thieu's arrest was unduly prejudicial. Defendant did not object to the evidence relating to Thieu's arrest on relevance grounds. He argued instead that whatever relevance existed was outweighed by the danger of undue prejudice.

Defendant also argues on appeal that evidence of Thieu's arrest was unduly prejudicial because it permitted the prosecutor to introduce evidence of defendant's bad character. Again, defendant did not raise this argument in the trial court. Defendant argued in the trial court that evidence of Thieu's arrest was prejudicial because it involved deceitful conduct by Thieu, not defendant, and because defendant will not dispute that he knew he was wanted for murder and fled California in 1991. Defendant did not preserve his appellate claim for review. In any case, this argument fails on the merits. Even if were we to conclude that the trial court erred in admitting the challenged evidence, any possible error would not require reversal of the judgment because defendant has not shown it is reasonably probable he would have obtained a more favorable result at trial in the absence of the error. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227 [we review error in admitting evidence under ordinary rules of evidence like Evidence Code section 352 under the reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818].) As we have explained, the evidence supporting the conviction is strong. There was other evidence that defendant fled California and evaded police capture for about 18 years. And defendant did not object to the other evidence indicating his consciousness of guilt.

In addition, the trial court instructed the jury that evidence of flight cannot prove guilt by itself. The jury was instructed on the prosecution's burden of proof and the required findings for murder,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

murder in the first degree, and attempted murder. The trial court told the jury not to let bias or prejudice influence its decision and to decide the facts based only on evidence presented in the courtroom. Upon defendant's request, the trial court also twice admonished the jury that it could not use evidence about Thieu's deceit against defendant. The trial court told the jury that evidence of Thieu's arrest was admitted for the limited purpose of establishing whether defendant knew he was wanted for the 1991 homicides. The trial judge said whether defendant knew he was wanted for those homicides was a question of fact for the jury to decide. We presume the jury followed the trial court's instructions. (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

(People v. Tran, LD 11 at 11-14.)

*Procedural Bar*

Respondent asserts petitioner's claim is barred by the contemporaneous objection rule. (ECF No. 12 at 29.)

As a general rule, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"   Walker v. Martin, 562 U.S. 307, 314 (2011) (quoting Beard v. Kindler, 558 U.S. 53 (2009)).  However, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim. Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same").  Where deciding the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claim on the merits and forgo an analysis of procedural default.  See Franklin, 290 F.3d at 1232 (citing Lambrix, 520 U.S. at 525).

In Melendez v. Pliler, 288 F.3d 1120 (9th Cir. 2002), the Ninth Circuit concluded that California's contemporaneous objection rule has been consistently applied "when a party has

failed to make any objection to the admission of evidence." Id. at 1125, citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981). California's rule requiring a contemporaneous objection to preserve issues for appeal has been deemed to be independent and adequate to bar federal review of constitutional claims. See Fairbank v. Ayers, 650 F.3d 1243, 1256 (9th Cir. 2011) (finding that California's contemporaneous objection rule was independent and adequate to bar federal review when a party fails to object to the admission of evidence); see also Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005).

Although it appears petitioner's objections to the evidence at issue may not have been preserved for purposes of appeal, here, for purposes of expediency, the undersigned elects to proceed to the merits of petitioner's claim rather than address the asserted procedural bar.

*Relevant Background*

During the trial, and outside the presence of the jury, the following occurred:

[THE COURT]: I did receive and review the prosecutor's offer of proof regarding evidence in connection with the defendant's brother's arrest in 1994.

Have you had an opportunity to review that, [defense counsel]?

[DEFENSE COUNSEL]: I have, Your Honor.

THE COURT: [¶] So the People intend to show that at the time of Thieu Tran's arrest in 1994, the defendant's wife was present and that Thieu Tran lived approximately one block away from Ricky Tran and his wife.

That's offered as proof in order to permit the inference that the defendant - - I guess if he did not know before then, he certainly would have learned from his brother's arrest the fact that he was wanted in connection with the 1991 murders.

He did not come forward to turn himself in or identify himself to law enforcement. Thus, his continued, the prosecution argues, continued flight evidences a consciousness of guilt.

In our chambers discussion, [defense counsel], you argued that any probative value was outweighed by the risk of prejudice since this conduct was on the part of defendant's brother.

First of all, … do [the People] wish to be heard any further?

[PROSECUTOR]: No.

THE COURT: [Defense counsel]?

[DEFENSE COUNSEL]: Yes. [¶] It is prejudicial because of the deceitful conduct by the brother. There is no evidence whatsoever that Ricky Tran even knew that his brother was arrested. There is no evidence that Ricky Tran knew that his brother would do this on his behalf.

THE COURT: [The prosecutor] is arguing that because they lived a short distance apart at the time and the fact that the defendant's wife certainly knew of the arrest, that the inference is that the defendant knew about it, which I think is a reasonable inference.

Of course, it is up to the jury to decide whether or not to draw that inference and what weight to give it.

[DEFENSE COUNSEL]: Right, but whatever relevant, marginal relevant evidence there is, it's to me outweighed by the prejudice and - -

[¶]-[¶]

THE COURT: … I am going to find that the evidence is probative. It is not substantially outweighed by the risk of prejudice. In fact, I don't see that there is any prejudice. This is going to the fact that the deceit was by the defendant's brother.

If you request, [defense counsel], I would admonish the jury not to hold defendant's Tran's brother's deceit against the defendant. They cannot consider this evidence for that purpose.

[DEFENSE COUNSEL]: If you just said that at the time the evidence is presented, I would be satisfied.

THE COURT: Well, that's what I will do then.

(3 RT 887-91.)

*Relevant Legal Standards*

A state court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation a petitioner's due process rights. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." Id.

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990). The

22

high court "has made very few rulings regarding the admission of evidence as a violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

Moreover, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley, 568 F.3d at 1101 (citing Carey v. Musladin, 549 U.S. at 77). In the absence of clearly established law that admission of even overtly prejudicial evidence constitutes a due process violation, the court cannot conclude that the state court's ruling was an "unreasonable application." Id. A federal court is "without power" to grant a habeas petition based solely on the admission of evidence. Id.

Even setting aside the issue of clearly established federal law, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), as amended, 421 F.3d 1154 (9th Cir. 2005). Again, "'[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.'" Holley, 568 F.3d at 1101. "Only if there are *no* permissible inferences the jury may draw from evidence can its admission violate due process." Alcala v. Woodford, 334 F.3d 862, 887 (9th Cir. 2003) (emphasis in original; citation omitted); Houston v. Roe, 177 F.3d 901, 910 n.6 (9th Cir. 1999). "Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" Jammal v. Van de Kamp, 926 F.2d at 920 (citation omitted). That can only occur if the admission of the evidence had a "'substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 623.

*Analysis*

Petitioner is not entitled to habeas relief because United States Supreme Court precedent does not clearly establish that admission of this type of evidence violates due process. See Holley, 568 F.3d at 1101.

Nevertheless, the state court reasonably concluded the trial court's determination as to the preliminary fact that petitioner had knowledge of his brother's arrest was without error because the jury could have reasonably inferred that knowledge from the evidence proffered. Alcala v. Woodford, 334 F.3d at 887.

And, even assuming for the sake of argument the evidence was erroneously admitted, petitioner has not met his burden. As noted earlier in these findings, there was other evidence of petitioner having fled California in the wake of the shooting, as well as the manner in which he eluded capture for nearly two decades relevant to his consciousness of guilt. (See 3 RT 894-96; 4 RT 903-04, 907-08, 933-34, 942, 983-84.) Hence, evidence concerning his brother's arrest would not have had a substantial and injurious effect on the jury's verdict finding petitioner guilty of the crimes. Brecht, 507 U.S. at 623. Petitioner did not meet his heavy burden to prove the admission of this evidence resulted in an unfair trial. Boyde v. Brown, 404 F.3d at 1172; Jammal v. Van de Kamp, 926 F.2d at 920.

The state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254. Therefore, this claim should be denied.

VI. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 11, 2020

tran1925.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE